UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARIA M. MARTINEZ,                    :

    Plaintiff,                        :

       vs.                            :     No. 3:07cv0699 (SRU)(WIG)

MICHAEL J. ASTRUE,                    :
COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,              :

    Defendant.                        :
-----------------------------X

RECOMMENDED RULING ON PENDING MOTIONS

This action is brought by Plaintiff, Maria Martinez,
appealing the decision of the Commissioner of the Social Security
Administration, denying her application for disability insurance
benefits.  See 42 U.S.C. § 405(g).  Pending before the Court are
Plaintiff's Motion for Summary Judgment and/or Remand **[Doc. # 8]**
and Defendant's Motion to Affirm **[Doc. # 15]**.  After reviewing
the administrative record in its entirety, the Court finds that
the decision of the Commissioner was supported by substantial
evidence and that the administrative hearing did not violate
Plaintiff's due process rights.  Accordingly, the Court
recommends that the decision be affirmed.

Procedural Background

On February 17, 2004,[1] Plaintiff filed an application for

_____

[1]  The Index to the Administrative Record, the ALJ's
Decision, and Plaintiff's Complaint indicate that Plaintiff's
application was filed on April 23, 2004.  However, it appears

1

disability insurance benefits under Title II of the Social
Security Act, 42 U.S.C. § 423, and for supplemental security
income under Title XVI, 42 U.S.C. § 1382 (R. 76), claiming that
she had been disabled since May 30, 2003, as a result of a motor
vehicle accident in which she sustained a disc injury and nerve
damage in her face and hands.  (R. 85).  Her claim was denied
both initially (R. 26) and upon reconsideration.  (R. 27).
Plaintiff then requested a hearing, which was held on April 10,
2006, before Administrative Law Judge ("ALJ") Eileen Burlison.
(R. 364).  Plaintiff, who was represented by counsel, testified
with the assistance of an interpreter.  Also testifying was a
vocational expert.  (R. 364-410).  On September 29, 2006, the ALJ
issued her decision finding that Plaintiff was not disabled, as
that term is defined under the Social Security Act.  (R. 25).
Using the five-step sequential evaluation process prescribed by
the Regulations, 20 C.F.R. §§ 404.1520(a) and 416.920(a), the ALJ
found that Plaintiff retained the residual functional capacity
("RFC") to perform work at the light level of exertion, with
certain additional restrictions, including the inability to
climb, to engage in overhead reaching, or to use her right hand
for repetitive gross manipulations.  Based on the testimony of

---

from the dates on the Application, as well as the Disability
Report (R. 85-91), and the Work Activity Report (R. 98-100) that
the application was filed on February 17, 2004.  This is also the
date set forth in Plaintiff's Motion.  (Pl.'s Mem. at 2).  The
exact date, however, is not material to this appeal.

the vocational expert, the ALJ determined that a significant
number of jobs existed in the local and national economies that
Plaintiff could perform even when her limited ability to speak
and write English was taken into consideration.  (R. 25).
Plaintiff then sought review from the Appeals Council, which
denied her request for review (R. 6-10), thus making the decision
of the ALJ the final decision of the Commissioner subject to
review by this Court.  20 C.F.R. § 405.372.

Standard of Review

The district court may "enter, upon the pleadings and
transcript of the record, a judgment affirming, modifying, or
reversing the decision of the Commissioner of Social Security,
with or without remanding the cause for a rehearing."  42 U.S.C.
§ 405(g).  Judicial review of the Commissioner's final decision
denying social security benefits, however, is limited.  Yancey v.
Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  It is not the court's
function to determine de novo whether a claimant was disabled.
See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, a
district court must review the record to determine first whether
the correct legal standard was applied and then whether the
record contains "substantial evidence" to support the decision of
the Commissioner.  42 U.S.C. § 405(g) ("The findings of the
Commissioner of Social Security as to any fact, if supported by
substantial evidence, shall be conclusive ....."); see Bubnis v.

<u>Apfel</u>, 150 F.3d 177, 181 (2d Cir. 1998); <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998). However, before deciding whether the Commissioner's decision is supported by substantial evidence, the Court much be satisfied that the claimant had "a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." <u>Echevarria v. Secretary of Health & Human Services</u>, 685 F.2d 751, 755 (2d Cir. 1982)(quoting <u>Gold v. Secretary of HEW</u>, 463 F.2d 38, 43 (2d Cir. 1972)).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must consider the entire record, examining the evidence from both sides. <u>Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988). Substantial evidence need not compel the Commissioner's decision; rather substantial evidence need only be that evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged. <u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations omitted). Substantial evidence is "more than a mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (internal citations and quotation marks omitted). It "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id.</u>

Thus, the role of this Court is not to decide the facts anew, nor to reweigh the facts, nor to substitute its judgment for that of the ALJ, Appeals Council, or Commissioner. Rather,

the decision of the Commissioner must be affirmed, absent an
error of law, if it is based upon substantial evidence, even if
this Court might have ruled differently.  See Eastman v.
Barnhart, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

## Factual Background

Plaintiff was born in 1962 in El Salvador.  (R. 76, 368).
She has a tenth grade education.  (R. 368).  She has been in the
United States since 1986 and has a limited ability to speak and
write English.  (R. 368, 144, 85).  Her past relevant work
experience was as a feeder and bagger in a Pepperidge Farm
bakery, where she worked for over ten years.  (R. 86, 368-69).
She quit working for the company in May 2003 when it moved to
another town and she "couldn't take working anymore, standing,
bending."  (R. 369).  Her date last insured is December 31, 2008.
(R. 18).

Plaintiff's relevant medical history dates back to October
of 1997 (R. 136), when she was involved in a motor vehicle
accident.  She was examined at Norwalk Hospital for right knee
discomfort and cervical neck pain and released.  (R. 132).
Plaintiff then saw her primary care physician, Dr. Jack Glasser,
and reported that her neck pain was better but that she had
mandibular pain, pain in her left hand, and was feeling anxious
and forgetful.  (R. 189-90).  When her neck and back symptoms did
not resolve, she saw Dr. Alan Schlein, who ordered x-rays of the

neck and back, which were reported to be normal. He prescribed an anti-inflammatory and physical therapy. (R. 142). Plaintiff also saw Dr. Philip Micalizzi, a neurologist, for her headaches, back and neck pain, and some residual right knee pain. (R. 144). He noted that she was getting good results from her regimen of analgesics and physical therapy and thought that she should make a gradual recovery from what was probably a sprain/strain injury. He ordered an MRI, however, to rule out a possible disc herniation. (R. 145). An MRI performed on December 12, 1997, showed very minimal bulging disc disease at the C4-C5 and C5-C6 levels. (R. 142).

In January, 1998, Plaintiff saw Dr. David Brown, an orthopedist, for persistent left-sided shoulder and upper arm pain. Although she had been released to light duty work, Plaintiff was not working due to the unavailability of such work with her employer. (R. 142). His impression was a myofascial strain, for which he prescribed Relafen and physical therapy and ordered her to stay out of work with a re-evaluation in three weeks. (R. 143).

On April 27, 1998, Plaintiff returned to see her primary care physician, Dr. Glasser, who noted that she had returned to work on February 23, 1998. She was complaining of pain in her left shoulder and arm and generalized weakness in her left hand. (R. 197). He noted that she had not had the MRI ordered by her

neurologist.  (R. 197).

In June 1998, she was referred to a pulmonologist, Dr.
Philip Simkovitz, for an evaluation of her complaints of chest
pain.  Dr. Simkovitz's impression was that Plaintiff had no
intrinsic pulmonary problem and that her discomfort was purely
musculoskeletal.  (R. 148).

In 1998, Plaintiff also began to experience sciatica
extending into her right leg.  An MRI showed herniated discs at
L4-L5 and L5-S1.  Dr. Brown felt she was a candidate for disc
surgery and referred her to Dr. Opalak, a neurosurgeon.  (R.
149).  In September, Dr. Opalak took a history from Plaintiff
who related that she had initially experienced neck pain and
lower back pain, followed exclusively by lower back pain and
right sciatica with some occasional numbness in her left arm.
She had undergone physical therapy on and off but was not in
physical therapy at that time.  Based upon his examination of her
and her MRI, which demonstrated "quite clearly disc herniations
at L4-5 and L5-S1," Dr. Opalak concurred with Dr. Brown that she
was a candidate for surgical intervention.  (R. 173-74).  On
November 10, 1998, Dr. Opalak  performed a hemilaminotomy, medial
fasciectomy, and a disc excision at L4-L5 on the right side.  (R.
150).  On December 4, 1998, Dr. Opalak reported that Plaintiff
was doing much better, free of leg pain, with just some numbness.
He felt it was time to start her on physical therapy and also

referred her to the Total Joint Center at Fairfield Orthopaedics
for evaluation of her left arm and shoulder pain and swelling.
(R. 177). The orthopaedic doctor that she saw at the Total Joint
Center was of the opinion that the pathology was not in the
shoulder, but rather was due to a left thoracic nerve palsy. (R.
158). He referred her to Dr. Sood at the Comprehensive Pain and
Headache Treatment Center for further evaluation.

Dr. Sood's report of December 18, 1998, indicates that
Plaintiff presented with complaints of pain in her left neck,
upper back, and left upper extremity associated with diffuse
swelling. She also complained of chest pain and lower back pain.
He noted that her recent back surgery had resolved the radiating
pain but that the lumbar pain had persisted. At the time, she
was taking Oxistat and Diazepam, as well as anti-hypertensives.
(R. 159). After examining Plaintiff, Dr. Sood's impression was
complex multifocal pains with some evidence of autonomic
dysfunction in the left upper extremity, which pointed in the
direction of a possible traumatic brain injury. (R. 160-61).

On January 22, 1999, Dr. Opalak reported that Plaintiff had
gradually continued to improve and was free of leg pain with just
a minimal amount of back pain. He was of the opinion that she
could return to work "within the limits that [he had] described"
effective February 1, 1999. (R. 178).

Dr. Sood next saw Plaintiff at the end of January 1999, at

8

which time she had less swelling in her left arm but continued to complain of diffuse upper extremity, shoulder, and chest pains. He recommended an anesthetic block of the upper and lower cervical roots through an epidural catheter, which would be implanted so that she could receive daily injections for a week on an outpatient basis. (R. 162-63).

On February 2, 1999, Dr. Opalak reported that Plaintiff returned with "some bizarre complaints some of which include a sensation of 'warmth' in her foot and 'swelling' in her chest." (R. 179). On examination, he "really [did] not find much" beyond some post-surgical leg numbness and a bit of ankle tenderness. (R. 179). He suggested that she might have sprained her ankle coming down a flight of stairs. (R. 179).

In June 1999, Plaintiff was referred to the Ahlbin Centers at the Yale-New Haven Health Center for pain management. The doctor recommended an aggressive out-patient physical therapy program, working on stretching, strengthening, range of motion, and home exercises, plus Neurontin to improve her sleep and to address some of the neuropathic components of her pain. (R. 164).

Dr. Opalak did not see Plaintiff again until September 1999, at which time she reported that she had been involved in two additional motor vehicle accidents. She was experiencing pain mostly in the area of her left shoulder. On examination, she

exhibited some spasms in her back and had complaints of sciatica-type symptoms in her right leg. Dr. Opalak felt that another MRI was warranted to see if she had a recurrent disc. (R. 180). In December, Dr. Opalak reported that fortunately, her MRI looked "quite benign" and that she was feeling much better. He told her that the only thing she needed to avoid was repetitive bending, twisting, and lifting. "Otherwise, she can carry on with her normal duties. This remains, of course, open-ended." (R. 181).

In March 2000, Plaintiff returned to see Dr. Opalak complaining of shoulder pain and neck discomfort. Dr. Opalak described her condition as "quite chronic" and ordered an MRI of the cervical spine and referred her to Dr. Malin for her shoulder pain, which he suspected might be bursitis. (R. 182). The MRI showed a "small right paracentral protrusion of the C4-5 disc without nerve root impingement." (R. 186). Six months later, she returned to see Dr. Opalak with no further complaints of neck pain, although she continued to have come discomfort in her back but without sciatica, which made "work very painful for her." (R. 183). After examining her, Dr. Opalak gave her a 20% permanent partial disability rating to her lumbar spine. (R. 183).

On June 25, 2001, Plaintiff underwent a lumbar epidural steroid injection by Dr. Sood at St. Vincent's Medical Center. (R. 165).

On October 25, 2001, Dr. Glasser wrote two notes stating that he had advised Plaintiff not to return to her work on the night shift until she was evaluated by an ophthalmologist for her complaints of marked difficulty driving at night due to her vision. He stated that he would have the ophthalmologist make a determination. (R. 206-07). In a subsequent note to the file dated November 9, 2001, Dr. Glasser wrote that Plaintiff had told his nurse about her fear of driving at night and her concern that she could get into an accident. (R. 210). She also told the nurse that she was fearful that she would hurt herself at work, where she worked with machinery, due to her headaches, dizziness, and eye pain that she had been experiencing. (R. 211). On November 15, 2001, Dr. Glasser wrote a note stating that Plaintiff had been evaluated by a neurologist, who had communicated that Plaintiff was neurologically stable and could return to work from a neurologic point of view. (R. 215). In November, Plaintiff saw Dr. Anitha Patel, an ophthalmologist for occasional pain in her left eye and "white light" in her eye. Dr. Patel's diagnosis was retinal migraine left eye, benign. The treatment plan was for Plaintiff to take baby aspirin and follow-up in six months. (R. 172).

On March 20, 2002, Plaintiff returned to see Dr. Opalak with complaints of discomfort in her back and right leg. She exhibited some limitations in her range of motion, but Dr. Opalak

saw no reason to obtain another MRI.  Dr. Opalak stated, "In so
far as her going back to work, I would rather, by far, have a
physiatrist – such as Dr. Brennan – decide on this."  (R. 184).

In May 2002, Plaintiff went to the medical department at her
employer, Pepperidge Farm, complaining of wrist and thumb pain,
which she believed was related to her work.  Her employer set up
an appointment with Dr. James Marshall.[2]  Plaintiff described
swelling and tenderness in her hands, which she said had been
present for about four to five months.  Dr. Marshall diagnosed
tendinitis and prescribed Celebrex, and modified duty with no
pronation or supination of the hands.  (R. 300).  On June 20,
2002, a medical record from Pepperidge Farm indicates that
Plaintiff had been placed on modified duty for muscle strain and
tendinitis in her thumbs and forearms.  (R. 305).  Medical
records from Pepperidge Farm in July and August state that
Plaintiff was still doing regular duty work because Plaintiff
found that her modified duties caused more pain in her wrists
than her regular job.  (R. 303).  However, on August 21, 2002,
the Pepperidge Farm medical records state that Plaintiff was
working in the raisin room and was tolerating modified duty
reasonably well.  In September, Plaintiff again saw Dr. Marshall
for pain over both wrists and forearms despite modified duty at

_____

[2]  Dr. Marshall appears to be a company doctor for
Pepperidge Farm, since many of his records appear on Pepperidge
Farm Medical Records forms.

12

work.  He prescribed physical therapy and continued light duty.
(R. 299).  Between September and December, Plaintiff failed to
show up for a number of scheduled appointments.  On December 27,
2002, Plaintiff was seen at the Medical Department for complaints
of bilateral wrist pain and swelling.  Plaintiff stated that it
hurt her hands working with the raisins.  (R. 306).

Plaintiff was seen by Dr. James Marshall in January and
February 2003 for complaints of persistent pain in both wrists
and forearms, the right being worse than the left.  He diagnosed
tenosynovitis and prescribed Medrol injections, a wrist brace,
and physical therapy.  (R. 297).  Plaintiff requested that her
employer refer her to another doctor.  In April, she saw Dr. Rago
for the pain in her hands and forearms.  Dr. Rago noted palpable
tenderness "just about everywhere [he] touched," although the x-
rays of both hands were normal.  His assessment was diffuse,
nonspecific pain pattern, most likely related to her work, which
involved repetitive use of her hands.  He did not feel there was
anything more he could do to treat her and suggested pain
management.  (R. 301).  Dr. Marshall reviewed this report and
indicated that she could resume "activity as tolerated – regular
duty," and that she should continue taking Celebrex.  (R. 302).
Plaintiff quit working on May 30, 2003, and on June 12th, Dr.
Marshall noted some improvement with physical therapy and her
finishing work.

On June 23, 2003, Plaintiff was seen by orthopaedist, Dr. Schlein, for problems in both elbows and in the first dorsal compartments of both hands. He noted that she had been treated by several other physicians and had been injected with Cortisone and prescribed Celebrex. Dr. Schlein ordered a series of rheumatoid blood tests. Over the next few weeks, Plaintiff reported feeling better after several Iontophoresis treatments of Cortisone. On July 7, 2003, he suggested that she could return to light duty work. (R. 234). On July 21, 2003, she saw Dr. Schlein still complaining of pain over the radial dorsal aspect of her right wrist. On examination, she had almost a full range of motion in her forearm and her blood studies were normal. Dr. Schlein suggested an MRI to rule out a tear in her cartilage. (R. 235). The MRI showed minor abnormalities but no gross tear of the cartilage, a few small cysts, the suggestion of a small ganglion cyst, and a question of minimal tenosynovitis along one joint. (R. 307).

In August 2003, Dr. Glasser referred Plaintiff to Dr. Raza for an evaluation of her chest pains. Her physical examination was normal except for local chest tenderness. (R. 233). A stress test showed a normal blood pressure response and was negative for ischemia. Dr. Raza wrote Dr. Glasser, "Please reassure her that the chest pains [are] non-cardiac." (R. 232).

In January 2004, Plaintiff saw Dr. Glasser for complaints of

lower leg pain.  She was taking Celebrex for her right hand.  She reported problems standing for an hour and stated that she felt as if would fall down.  (R. 237).  In May, Plaintiff was seen at the Bridgeport Community Health Center for complaints of arm and back pain.  (R. 311-13).  Notes from the Health Center indicate that Plaintiff had no psychiatric symptoms and did not need mental health services.  (R. 312).

In June 2004, she was seen by Dr. Jesus Lago with the Connecticut Disability Determination Services for a consultative evaluation of her depression that she had suffered for the past few months due to increased pain.  He reported that she had no prior psychiatric history.  He noted that she last worked in May 2003.  She stated that she could no longer work because of back and neck pain.  At the time of her visit, she was spending her time at home, where she cooked, did light chores and errands. Dr. Lagos diagnosed her with depressive disorder.  He found that she was capable of handling her affairs and would be able to interact appropriately with co-workers, supervisors, and the public.  (R. 239-40).  He rated her impairments as "not severe" (R. 241), and found that they would impose only mild restrictions on her activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (R. 251).  Dr. Kirk Johnson made the same findings in his psychiatric

review, except he found that her mental disorder would impose no restrictions on the activities of daily living. (R. 255-65).

Plaintiff was also evaluated in June 2004 by Dr. Martin Stransky for the Connecticut Disability Services. Plaintiff was complaining of pain in both hands that had begun about a year before when she was performing work involving repetitive activity. At the time of her examination, Plaintiff did not feel that she could use her hands for any type of repetitive activity, including housework. She also complained of diffuse pain in her left neck and lumbosacral region, which she related to the motor vehicle accident in 1997. She stated that she suffered from near constant left paracervical pain, which sometimes radiated into her left shoulder. She also experienced numbness in her left face. She described her back pain as almost constant, worse with bending, standing or any type of activity. Occasionally, she experienced radicular symptoms. She attributed the increase in her neck pain and low back pain to her inability to see her physicians for pain management and physical therapy due to insurance issues. (R. 269). Plaintiff also reported a "fair amount of intermittent depression." (R. 269). She was taking Celebrex for her pain and Paxil for her depression. (R. 270). Dr. Stransky's impression was that objectively, she had a fair amount of paracervical and paralumbar spasm on both sides, depression in her background, and possibly a low pain threshold.

16

He noted that she was anxious to resume routine physician care and physical therapy. He found that she had no difficulty with fine motor control of her hands and did not need an assistive device for ambulation. (R. 271).

On January 12, 2005, Dr. Ayanna Buckner also performed a consultative examination for the Connecticut Disability Determination Services. Her impression was that Plaintiff faced significant limitations as a result of her injuries, including limited range of motion at the neck, upper extremities, and lower extremities, which she believed to be related to her injuries from the motor vehicle accident in 1997. (R. 274-75). In the history taken from Plaintiff, Dr. Buckner noted that Plaintiff reported that she had stopped working in May 2003 as she had been working light duty for one year and was told that she would have to return to full duty or be fired. (R. 274).

A Residual Functional Capacity Assessment was performed by Dr. Steven Edelman in February 2005. He found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk four hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had an unlimited ability to push and/or pull except as shown for lift and/or carry. He found that Plaintiff occasionally exhibited all postural limitations, except she should never engage in rope climbing. He determined that Plaintiff had no

17

manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations.  (R. 276-85).  A second RFC Assessment was performed by Dr. Honeychurch, who found the same exertional limitations except that Plaintiff could stand for six hours in an eight-hour workday, the same postural limitations except no climbing ladders, ropes or scaffolds, and to she needed to avoid concentrated exposure to vibration.  (R. 289-96).

In December 2005, Plaintiff was seen at St. Vincent's Medical Center for complaints of low back pain.  She had been on Celebrex and Neurotin, but currently was taking Advil and using a heat pack, which worked moderately well.  Straight leg raises caused pain to radiate into her right leg.  She was tender to palpation in the lumbar region.  Sensory findings were normal, and Plaintiff walked with a normal gait.  (R. 350).

Plaintiff claims that she is now totally and permanently disabled as a result of herniated lumbar discs, surgically corrected, at L4-L5 and L5-S1, with radicular symptoms in both legs, and moderate stenosis at both levels, a protruding cervical disc at C4-C5, chronic and severe pain in her back, neck, left upper extremity, and left side of her face, and right wrist and elbow tendinitis.  (Pl. Compl. ¶ 7).

At the hearing before the ALJ, Plaintiff testified that she lives with her husband and three children, who were all in school

at the time.  (R. 370-71).  In terms of her daily activities, she could do a little bit of house cleaning and cooking, she shopped but only with her husband, she read and watched television, she went to church, she could drive but did so rarely.  (R. 371-77).  The last time she traveled was in December 2003 to El Salvador when her father died.  (R. 376).

At the hearing before the ALJ, Plaintiff testified that she was seeing her doctors once a month for pain in her back, hands, and head.  She was receiving injections in her hands for the pain.  (R. 377-80).  She testified that she also had pain on the left side of her forehead for which she was taking Tylenol, "the strong one."  (R. 381).  She also had pain radiating from her back down her right leg, for which she was taking pain medication (R. 382, 389), and swelling in her right knee.  (R. 389).  She reported that she had high blood pressure, for which she was taking medication every night.  (R. 383).  She stated that she also had problems with her nerves and had taken Paxil in the past.  (R. 383, 390).  At the time of the hearing, however, she was not on any medication for her nerves but was planning to see a doctor in the next few weeks.  (R. 383).

Regarding her limitations, Plaintiff testified that could only walk about half a block comfortably.  She had difficulty climbing stairs.  She had problems sitting or standing for a long period of time, which she described as fifteen to twenty minutes.

She had no strength in her hands and could not lift a laundry
basket or anything heavy because of her back.  She could not make
a fist with her right hand.  (R. 384-87).  Her right hand was the
one that hurt her; her left hand and arm became numb.  She would
get swelling and pain from her neck down her entire arm.  (R.
388).

## Discussion

In her appeal of the Commissioner's decision, Plaintiff
raises two arguments.  First, she maintains that the ALJ erred in
finding that she was not disabled.[3]  Second, she claims that the
ALJ erred in conducting the hearing in such a manner as to render
it inherently unfair, thereby denying her due process of law.
The Court will consider Plaintiff's due process argument first,
for if Plaintiff were denied due process, a remand would be
required and the Court would not need to reach the merits of her
other claim.

## I.  Due Process

Plaintiff argues that she was denied due process of law at
the hearing in that she was denied full access to the interpreter
and was treated with hostility by the ALJ.

---

[3]  Plaintiff phrases the argument as "There is substantial
evidence in the record to support of finding of disabled."  That,
however, is not the correct standard of review.  Rather, the
issue before the Court is whether substantial evidence supported
the decision of the Commissioner.  See Standard of Review at 3-4,
supra.

Under the Social Security Act, a disability claimant is
entitled to a "full hearing under the Secretary's regulations and
in accordance with the beneficent purposes of the Act." Gold v.
Secretary of Health, Education and Welfare, 463 F.2d 38, 43 (2d
Cir. 1972); see also Echevarria v. Secretary of Health & Human
Services, 685 F.2d 751, 755 (2d Cir. 1982). Both the Act and
fundamental principles of due process[4] "require that a claimant
receive meaningful notice and an opportunity to be heard before
his claim for disability benefits can be denied." Stoner v.
Secretary of HHS, 837 F.2d 759, 760-61 (6th Cir. 1988)(citing 42
U.S.C. § 405(b)). The regulations confirm a claimant's right to
appear before an ALJ to present evidence and to state his or her
position. See 20 C.F.R. §§ 405.350(a), 416.1450(a). They
further provide that the ALJ will conduct the proceedings in an
orderly and efficient manner. The ALJ will "look fully into all
of the issues raised by [the applicant's] claim, will question

_____

[4]  The Supreme Court has held that a person receiving
benefits has a property interest in the continued receipt of
benefits. Mathews v. Eldridge, 424 U.S. 319, 322 (1976). The
Supreme Court, however, has not addressed whether an applicant
for benefits has a protected property interest in benefits he or
she hopes to receive. Hepp v. Astrue, 511 F.3d 798, 804 n.5 (8th
Cir. 2008). In Richardson v. Perales, 402 U.S. 389, 401-02
(1971), the Supreme Court assumed that due process applied to
social security disability hearings without determining whether
the plaintiff had a property interest. Id. This Court will
likewise assume that due process applies for purposes of this
decision, although in light of the fact that the administrative
hearings are non-adversarial in nature, full courtroom procedures
do not apply. Id. at 804.

[the applicant] and other witnesses, and will accept any evidence relating to [the] claim" that is submitted in accordance with 20 C.F.R. § 405.331. 20 C.F.R. § 405.320(a). The ALJ will also receive any evidence that he or she believes relates to the applicant's claim. 20 C.F.R. § 405.350(b). As the Supreme Court held in <u>Richardson v. Perales</u>, 402 U.S. 389, 401-02 (1971),

> [I]t is apparent that (a) the Congress granted the Secretary the power by regulation to establish hearing procedures; (b) strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent; and (c) the conduct of the hearing rests generally in the examiner's discretion. There emerges an emphasis upon the informal rather than the formal. This, we think, is as it should be, for this administrative procedure, and these hearings, should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should be liberal and not strict in tone and operation. This is the obvious intent of Congress so long as the procedures are fundamentally fair.

The Court has carefully reviewed the forty-five page hearing transcript. The record reflects that a translator was present for the entire hearing. The ALJ requested that Plaintiff, who speaks some English, answer the questions without interpretation, if she were able to do so, which Plaintiff appears to have done.[5]

---

[5] The transcript only indicates remarks by the interpreter as "INTP" when the interpreter was speaking for himself. If he was translating an answer for Plaintiff, his response is attributed to Plaintiff, and appears in the transcript as an answer to the question. Thus, it is not clear through most of the transcript when Plaintiff was speaking for herself or when she was speaking through the interpreter.

(R. 368). The ALJ questioned Plaintiff about her personal and
work background (R. 368-70), about her daily activities (R. 370-
77), about her medical treatment (R. 377-86), and about her
limitations (386-88). The ALJ asked Plaintiff to answer the
questions verbally, rather than by pointing, so as to ensure an
accurate transcript (R. 381), but there is nothing in the record
to suggest that the ALJ prevented Plaintiff from fully and
completely answering all of her questions. Indeed, the ALJ gave
Plaintiff's attorney an opportunity to ask additional questions
of his client. His examination of his client covers six pages of
the transcript. (R. 388-94). He questioned her about her
current symptoms and why she quit working. He certainly could
have reviewed any question which he felt she had not been given
an opportunity to answer fully and completely. (R. 388-93).
Furthermore, Plaintiff has not cited a single response which,
upon review, appears to have been incomplete or incorrect.

Plaintiff's counsel complains that Plaintiff was denied full
access to an interpreter or translator. However, there is
nothing in the record supporting this argument.

Plaintiff also argues that the ALJ exhibited hostility
toward her, but again the record simply does not support this
claim. There were some exchanges between the ALJ and
Plaintiff's counsel that could be construed as the ALJ's
exhibiting hostility toward counsel, and _vice versa_, but there is

nothing to suggest that this hostility spilled over to Plaintiff or in any way adversely affected the ALJ's decision. Plaintiff also points to the fact that the ALJ refused to allow her husband to be present for the hearing. There is nothing in the record to support this assertion, although the Court has no reason to doubt Plaintiff's claim in this regard. The Court, however, finds no error. The regulations provide that a hearing is open to the claimant and to the other persons the ALJ considers necessary and proper. 20 C.F.R. § 405.320(a). Plaintiff does not allege that her husband would have testified as a witness. She simply wanted him present for morale support.

Accordingly, the Court finds that Plaintiff received a full and complete hearing and that she was not denied procedural due process in connection with the administrative hearing.

II. Substantial Evidence

Having found that Plaintiff was afforded a full and fair hearing, the Court turns to the substantive issue of whether the ALJ's decision was supported by substantial evidence. Plaintiff argues that the ALJ erred in failing to take into consideration Plaintiff's inability to use both arms for repetitive motions and in limiting counsel's cross-examination of the vocational expert.

The ALJ found that Plaintiff could perform light work that did not involve climbing or overhead work with her both arms, that did not require repetitive use of the right arm and hand for

gross manipulation; and that involved simple and routine tasks.
The ALJ presented the vocational expert with a hypothetical that
included these limitations, as well as the fact that Plaintiff's
dominant language was Spanish, and that she had certain postural
limitations. (R. 396-97). The vocational expert testified that
Plaintiff could work as a security officer, of which there are
approximately 200 such jobs in Connecticut and 100,000 in the
national economy; a parking lot attendant, of which there are
approximately 100 such jobs in Connecticut and 7,000 in the
national economy; and as an inspector, of which there are
approximately 100 such jobs in Connecticut and 4,000 in the
national economy. (R. 397-98). These figures took into account
Plaintiff's limited ability to speak English. Thus, the total
number of jobs identified by the vocational expert that Plaintiff
should be able to perform was 400 in Connecticut and 111,000
nationally.

Based on the ALJ's finding that Plaintiff retained the RFC
to perform work at the light level of exertion, with the
additional limitations noted above, a finding that Plaintiff does
not challenge, the ALJ determined that Plaintiff was not
disabled.

The ALJ's conclusion as to Plaintiff's RFC was supported by
the two state agency medical reviewers. (R. 276-96).
Additionally, at the time that Plaintiff alleges she became

disabled, in May 2003, she had been performing light duty work for at least a year. Just the month before, Dr. Marshall, in April 2003, had found that Plaintiff could resume "activity as tolerated – regular duty." (R. 302). In June, several weeks after she alleges she became disabled, she showed significant improvement with physical therapy and being away from her job that required repetitive movements with her hands. (R. 302). In July, her orthopaedist suggested that she could return to light duty work. (R. 234). In June 2004, Plaintiff reported to Dr. Lago that she could perform light chores and errands. (R. 239). Thus, there was substantial evidence to support the ALJ's assessment as to her RFC.

Plaintiff, however, argues that her limitations were more severe than those included in the ALJ's hypothetical questions to the vocational expert. Specifically, she challenges the ALJ's failure to include in his hypothetical an inability to perform repetitive movements with both hands. Citing Lowe v. Apfel, 226 F.3d 969, 974 (8th Cir. 2000), she claims that her inability to use both of her hands for repetitive activities essentially eliminates all jobs in the national economy.

There was evidence in the medical records that Plaintiff had problems with both of her hands, although she did testify that the problems with her right hand were worse than the left. (R. 393). Neither doctor who completed a RFC assessment, however,

noted any manipulative limitations.  (R. 279, 292).  Dr.
Stransky's report of June 11, 2004 indicates that Plaintiff had
no difficulty with fine motor control of her hands.  (R. 271).
Additionally, there was evidence that Plaintiff's condition with
her hands had improved with physical therapy and finishing work.
(R. 302).  Nevertheless, even assuming that Plaintiff's carpal
tunnel syndrome was sufficiently severe that she could not
perform repetitive activities with both hands, the Court finds
that there was no error in the ALJ's failure to include this
limitation in his hypothetical question to the vocational expert.

Initially, the Court notes that Plaintiff's counsel had
ample opportunity to include this additional limitation in his
questions to the vocational expert during the hearing but failed
to do so.  (R. 398-409).

Additionally, the Eighth Circuit's decision in Lowe does not
stand for the proposition that an inability to use both hands for
repetitive activities eliminates all jobs in the national
economy.[6]  Indeed, the Court expressly rejected that argument.

> Ms. Lowe . . . argues . . . that the ALJ's finding
> that she "must not perform repetitive activity
> with her hands" precluded her from doing any work.
> Although we disagree with Ms. Lowe's contention

---

[6] A similar argument was raised by the plaintiff in Hughes
v. Chater, No. 94Civ.3065(TPG), 1997 WL 598475, at *4 (S.D.N.Y.
Sept. 24, 1997), and rejected based on a treating physician's
report that the plaintiff had no limitation in her ability to
perform fine manipulations with either hand or her ability to
grasp, push, or pull with her right hand.

> that the ALJ's findings necessarily require an
> award of benefits, we conclude that his findings
> provide an inadequate basis for our review and
> that we must remand the case for further
> proceedings.

226 F.3d at 972 (emphasis added). Because the ALJ had failed to

make the necessary comparison of Ms. Lowe's residual functional

capacity to use her hands with the demands of her past work as a

home attendant and laundromat manager, the Court remanded the

case for further proceedings. Id.

Finally, the Court finds, based on the vocational expert's

testimony concerning the three occupations that he identified,

parking lot attendant, security guard, and inspector, that even

had this additional limitation been included, it would have had

little, if any, impact on the number of jobs in the local and

national economies. Thus, Plaintiff was not prejudiced by the

ALJ's failure to include this additional limitation. See Brown

v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995).

Plaintiff's counsel questioned the vocational expert about

the occupations that he had identified. As noted above, none of

his questions included the limitation of no repetitive activity

with both hands. With respect to the job of parking lot

attendant, Plaintiff's counsel asked whether someone with right

wrist problems could perform this job, which he assumed would

require driving cars with manual shift transmissions. The

vocational expert clarified that the parking lot attendant job he

28

had identified involved directing people into a parking lot and supervising the lot.  It would not involve parking cars, which is the job of a parking valet, a different job than parking lot attendant. (R. 400-01, 403-05).  Thus, the inability to perform repetitive activities with both hands would seemingly have no impact on this particular job.

With respect to the job of security guard, the vocational expert limited the number of jobs to ones that a Spanish-speaking person could perform.  He conceded that this job would involve writing very brief reports occasionally (R. 406-07), but since Plaintiff is right-handed, the ALJ's failure to include a limitation concerning her inability to perform repetitive activities with her left hand should have no impact on this particular job.

Lastly, with respect to the job of inspector, the ALJ described it as "just visually looking at finished product to make sure that . . . there's [sic] no defects in it."  (R. 398). The inability to perform repetitive activities with both hands should again have no impact on this particular job.

Plaintiff also cites as error the ALJ's refusal to let the vocational expert testify as to whether the number of jobs that he had identified constituted a "substantial number of jobs in

the State of Connecticut."[7]  (R. 400).  The ALJ took the position

that this was a matter for the ALJ, not the vocational expert.

Plaintiff cites no case in support of her argument that this

was error.  Neither the Government nor the Court has been able to

identify a case specifically addressing this issue.  However,

based on the language of the statute and regulations, the Court

finds that this is a decision to be made by the ALJ, not the

vocational expert.  The Social Security Act, 42 U.S.C. §

423(d)(2)(A), includes this issue in the determination of whether

an individual is under a disability, a determination ultimately

reserved for the Commissioner.  The regulations, 20 C.F.R. §§

404.1520, 404.1566, likewise indicate that this is a

determination for the Social Security Administration.  This

determination is part of the well-known, five-step sequential

evaluation process employed by the ALJ when making a

---

[7]  Plaintiff's counsel also tried to elicit testimony from
the vocational expert as to the actual availability of job
openings in the occupations that he had identified.  (R. 400).
That issue is immaterial to the determination of disability under
the Social Security Act.  See 42 U.S.C. § 423(d)(2)(A) (providing
that the determination of whether an individual can engage in any
other kind of substantial gainful activity which exists in the
national economy shall be made "regardless of whether such work
exists in the immediate area in which he lives, or whether a
specific job vacancy exists for him, or whether he would be hired
if he applied for work")(emphasis added); 20 C.F.R. § 404.1566(b)
(stating that, inter alia, the lack of work in the local area,
the lack of job openings, cyclical economic conditions, the
hiring practices of employers, and the claimant's inability to
get work are not factors that will be considered in determining
whether work that the claimant can perform exists in significant
numbers).

determination of disability.  20 C.F.R. § 404.1520.  "We consider

that works exists in the national economy when it exists in

significant numbers either in the region where you live or in

several other regions of the country."  20 C.F.R. § 404.1566(a).

That same section provides for the use of vocational experts to

determine whether the claimant's work skills can be used in other

work and the specific occupations in which they can be used.  20

C.F.R. § 404.1566(d).  This provision, however, makes no mention

of using a vocational expert to decide if the work that he or she

has identified exists in significant numbers either in the region

where the claimant lives or in several other regions of the

country.  The Court finds no error in the ALJ's disallowing this

line of questioning of the vocational expert.

Plaintiff also argues that the ALJ prevented counsel from

inquiring into the requirements of the occupations identified by

the vocational expert.  The Court has carefully reviewed the

transcript of the proceedings and disagrees.  Plaintiff's counsel

questioning of the vocational expert covers over ten pages of the

transcript.  (R. 398-409).  It was only when the attorney's

questions became argumentative and were delving into areas that

were irrelevant that the ALJ cut off the cross-examination.  The

Court finds no error in this regard.

The Court concludes that the ALJ's decision that Plaintiff

was not disabled was supported by substantial evidence and that

she did not err in limiting counsel's cross-examination of the vocational expert or in her hypothetical question to the vocational expert.

## Conclusion

After a careful review of the record and consideration of the parties' arguments, the Court finds that Plaintiff was not denied due process and that the ALJ's decision is supported by substantial evidence in the record. Accordingly, the Court recommends that Defendant's Motion to Affirm **[Doc. # 15]** be granted, and that Plaintiff's Motion for Summary Judgment and/or Remand **[Doc. # 8]** be denied.

Any objections to this Recommended Ruling must be filed within ten (10) days of receipt of the ruling. Failure to object within ten (10) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; D. Conn. L. Civ. R. 72 for Magistrate Judges; FDIC v. Hillcrest Assocs., 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED, this ___27th___ day of February, 2008, at Bridgeport, Connecticut.


_/s/ William I. Garfinkel_____
WILLIAM I. GARFINKEL
United States Magistrate Judge